UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                      .    Case No. 21-15113-VFP
                            .
SUPPORTIVE HEALTH LLC,      .    M.L.K. Federal Building
                            .    50 Walnut Street, 3rd Floor
                            .    Newark, NJ 07102
          Debtor.          .
                            .    December 7, 2021
. . . . . . . . . . . . ..       11:19 a.m.
```

TRANSCRIPT OF MOTION TO DISMISS CASE AND
MOTION FOR TURNOVER OF PROPERTY

BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             By:  CARLINE BOLIVAR, Pro Se
                            85 Sycamore Road
                            Jersey City, NJ  07305

For the Creditor,           Becker LLC
Eric Raymond Perkins:       By:  JUSTIN BAUMGARTNER, ESQ.
                            354 Eisenhower Parkway, Suite 1500
                            Livingston, NJ  07039

For the Creditor,           City of Milwaukee
Cit of Milwaukee:           By:  HANNAH JAHN, ESQ.
                            Assistant Attorney
                            City Hall, Room 800
                            200 East Wells Street
                            Milwaukee, WI, 53202

Audio Operator:             Mariela Primo

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

1          THE COURT:  Six, seven and eight, Supportive Health

2   LLC, 21-15113.  There's a motion to dismiss, a motion by the

3   debtor's principal.  There's a motion for turnover by the

4   Trustee, and there's an objection, and then there's also a

5   cross motion by Supportive Health to vacate an order shortening

6   time and staying proceedings until really today, so that's kind

7   of moot.  So, can I have appearances, please?

8          MR. BAUMGARTNER:  Good morning, Your Honor, Justin

9   Baumgartner, on behalf of the Chapter 7 Trustee.

10         THE COURT:  Good morning.

11         MS. JAHN:  Good morning, Your Honor.  This is Hannah

12  Jahn, Assistant to the Attorney for the City of Milwaukee.

13         THE COURT:  Okay.  Good morning.

14         MS. BOLIVAR:  Good morning, Your Honor.  My name is

15  Carline Bolivar.  I filed a motion as a creditor of Supportive

16  Health LLC, and I'm also the sole member and principal of

17  Supportive Health LLC.

18         THE COURT:  Okay.

19         MS. BOLIVAR:  I'm a creditor by way of $366,000

20  capital that I invested in Supportive Health LLC.  That

21  investment is documented in the operating agreement that I

22  submitted to the Court in my motion to dismiss.

23         THE COURT:  Okay.  Just so you understand, and this

24  is part of the reason why it's good to have counsel, is that

25  what you just said demonstrates that you are a equity holder or

1   a member owner of the LLC and not a creditor.  Okay?

2          There's a big difference between equity and ownership

3   status and being a creditor.  You correctly identified yourself

4   as the owner of the equity pursuant to the operating agreement,

5   assuming that's the latest operating agreement, but it did not

6   -- did not correctly identify yourself as a creditor, based on

7   what I know.

8          I haven't seen any other evidence of indebtedness,

9   but, in any event, we have a motion to dismiss the case by Ms.

10  Bolivar and the cross motion by Ms. Bolivar to vacate an order

11  shortening time, which is really moot, and stay the motion

12  until the Court decides the motion to dismiss, which is all

13  going to be decided today.

14         So, those -- that's really moot and that's taken care

15  of, so it makes sense to me to deal with the motion to dismiss

16  first, because if we -- if the case is dismissed, then there's

17  no turnover, but if not, then there would be, then we'll go

18  forward with the turnover motion.

19         So, Ms. Bolivar, I see that you indicate that you

20  want the case dismissed, essentially because the filing was

21  unauthorized.  Is that correct?  You didn't authorize the

22  filing?

23         MS. BOLIVAR:  Yes, Your Honor.

24         THE COURT:  That's the principal -- or is it -- is

25  there another ground -- well, the other ground is that there

1  are other assets available to pay creditors, right?

2          MS. BOLIVAR:  No, Your Honor.

3          THE COURT:  I'm sorry?

4          MS. BOLIVAR:  I filed a motion to dismiss the

5  bankruptcy as the bankruptcy is void ab initio.  The motion to

6  stay and the motion to vacate the order shortening time are all

7  dependent on the motion to dismiss, Your Honor.

8          THE COURT:  Okay.  All right.  So, then I see that

9  the -- you know, the trustee takes issue with many of your --

10 many of your statements, but I -- myself, I'm going to look at

11 -- let's see.  One second here.  I don't know.  Where is it

12 now?  Okay.

13         Now, this case was filed back in June of 2021 by --

14 purportedly by this Lento Law Firm, and then what happened was

15 it was discovered that Mr. Perrault, who has the same address

16 as you, Ms. Bolivar, was filing the papers using their

17 credentials without their authorization.  That's why they

18 withdrew, and that was back in August, and on August 18th, you

19 wrote to the Court and an email that was delivered before the

20 hearing, which I don't believe you attended, on August 19th at

21 8:45.

22         You said Supportive Health LLC has been made aware

23 that its bankruptcy filing is in jeopardy of being dismissed

24 because of effective -- ineffective counsel.  Given the time --

25 the money and time that Supportive Health has already invested

1  towards the bankruptcy, it would not be just to dismiss the

2  bankruptcy without giving Supportive Health an opportunity to

3  be represented by competent counsel, and then you say you want

4  30 more days to retain new counsel.  That doesn't sound like

5  the bankruptcy was unauthorized, Ms. Bolivar.

6          MS. BOLIVAR:  It was never authorized, Your Honor.  I

7  never signed anything about -- in this.

8          THE COURT:  No, no.  But you can say that to me that

9  you -- that you can say that to me, but what is in the record

10 and before the Court is what you also said to me in August,

11 when you didn't want the case dismissed and you spent a lot of

12 time and money invested in the bankruptcy.  Isn't that

13 contradictory, at least?

14         MS. BOLIVAR:  I did not sign that letter, Your Honor.

15         THE COURT:  The letter came from you.  It says,

16 Sincerely, Carline Bolivar, from the same email address and

17 then, Ms. Bolivar, your --

18         MS. BOLIVAR:  (Indiscernible).

19         THE COURT:  -- your papers are devoid, conspicuously

20 devoid of any message -- any mention of Mr. Perrault.  What

21 about all the things that he did?

22         MS. BOLIVAR:  So, Your Honor, the motion to dismiss

23 mention everything.

24         THE COURT:  No.  It does not.  It doesn't mention Mr.

25 Perrault.

1          MS. BOLIVAR:  Yes, it mention Mr. Perrault.

2          THE COURT:  Well, what -- did you say to Mr. Perrault

3   is not -- does not live in the same address as you?

4          MS. BOLIVAR:  (No audible response).

5          THE COURT:  Does it say that Mr. Perrault wasn't the

6   one that transferred these properties into Supportive for no

7   consideration?  Does it address those issues at all?

8          MS. BOLIVAR:  It mention -- my motion to dismiss says

9   (indiscernible) Mr. Perrault.

10         THE COURT:  Yes, I know.

11         MS. BOLIVAR:  Mr. --

12         THE COURT:  Yes, that's -- that's okay.  That's a --

13  I understand, but that doesn't answer my question.  Then on --

14  then on October 13th, you wrote to the Court again, and in that

15  letter you said the case was initially filed as a Chapter 11

16  bankruptcy to give Supportive Health LLC an opportunity to

17  restructure its debt.

18         MS. BOLIVAR:  Your Honor, my phone is dying.  I have

19  to switch to another phone.

20         THE COURT:  Okay.

21                    (Pause)

22         MS. BOLIVAR:  Yes, Your Honor.

23         THE COURT:  Yes.  So, on October 13th you wrote to

24  the Court again, as I said.  I think I -- I think you've heard

25  this already, but it says this case was initially filed as a

7

1 Chapter 11 bankruptcy to give Supportive Health an opportunity

2 to restructure its debt.  That doesn't sound like it was an

3 unauthorized filing either.

4        And then you said to me -- I said to you that you

5 said Supportive Health has other assets and if I'm -- and to

6 pay the debt that's owed, and the sentence is, the bankruptcy

7 -- the information used by the Chapter 7 bankruptcy is flawed.

8 Supportive Health has -- LLC has assets.  Supportive Health LLC

9 has funds to pay the debt owed, and you say the same thing in

10 your certification, essentially, but there's no support for any

11 of that, except for the other asset, the other property that

12 wasn't disclosed.

13        MS. BOLIVAR:  Your Honor, the bankruptcy was not

14 filed by an attorney.  The attorney of record, Mr. Joseph

15 Lento, advises that his credential was stolen, and that all of

16 the petition and all of the schedules were filed by a lone

17 attorney, Mr. Perrault Jean-Paul.

18        THE COURT:  Right.  But now what -- see, this is what

19 I'm concerned about, right?  This is what I'm concerned about,

20 Ms. Bolivar.  I am concerned that the proceeding was adversely

21 impacted by the improper conduct of Mr. Perrault, who -- which

22 has not been denied ever by Mr. Perrault, who I emphasize is at

23 your same address and is the one who transferred these two

24 properties, which are, apparently, the only principal assets of

25 this LLC, into the LLC for no consideration, and he's also on

8

1 the lease, and there's no mention of Mr. Perrault.

2        So, from these papers, it is easy for me to infer, if

3 not find, that the bankruptcy was very directly and

4 intentionally authorized and was not just by Mr. Perrault's

5 words, but by yours, and that the scheme was uncovered, and now

6 that the scheme was uncovered, it's being used as a reason to

7 dismiss the bankruptcy, and I don't -- I'm not going to allow

8 that in my courthouse.  I -- in my court room.  I will consider

9 evidence that is appropriate evidence, but without anything

10 from Mr. Perrault and just your certifications that directly

11 contradict your letters and directly contradict what has

12 happened in the case to date but are consistent with a pattern

13 of delay that has been prevalent in these case -- in these

14 proceedings with the City of Milwaukee since 2016, I have no

15 basis to dismiss this case right now.  I have basis to continue

16 it.  I have -- my concerns are highlighted by what I have --

17 are heightened not highlighted, are heightened by what I'm

18 hearing and what I'm being told.

19        MS. BOLIVAR:  Your Honor -- sorry about that.  Your

20 Honor, (indiscernible) to file document, resolution to file

21 Chapter 11 Subchapter V, reorganization is not mine.  If the

22 Court compares that signature to the signature on any of my

23 signed or on my U.S. passport, which I sent a copy to Mr. Juan.

24        THE COURT:  Yes, I got -- I have --

25        MS. BOLIVAR:  Your Honor --

9

1          THE COURT:  I have the passport.  It's -- I have the

2    passport, but I still don't have anything from Mr. Perrault,

3    and I don't have anything about the relationship between you

4    and Mr. Perrault and whether you authorized Mr. Perrault and

5    that was what you intended to do as is evidenced by these

6    letters, and then when it went bad, you decided to change

7    course.

8          MS. BOLIVAR:  The principal and sole member of

9    Supportive Health never authorized the filing, Your Honor.

10          THE COURT:  Well --

11          MS. BOLIVAR:  Signed any of the documents of the

12    filing and created the resolution to file bankruptcy.

13          THE COURT:  Well, how about --

14          MS. BOLIVAR:  -- (indiscernible) --

15          THE COURT:  Then why did you tell --

16          MS. BOLIVAR:  -- (indiscernible) --

17          THE COURT:  Why did you tell me on October 18th that

18    the case was filed as a Chapter 11 bankruptcy to give

19    Supportive Health an opportunity to restructure its debt?

20          MS. BOLIVAR:  I did not write the letter.

21          THE COURT:  No.  Okay, but the letter is from you.

22    It's signed by you and then in August you did -- it's the same

23    thing, and so then now it seems like the delay is being taken

24    advantage of again and then dismissed so everybody has to start

25    all over again.

10

1          I'll hear from -- I understand your arguments.  You

2    can tell that I'm not very convinced by them, but I'll hear

3    from any other party that wants to be heard now.  Probably the

4    trustee and the City of Milwaukee.

5          MR. BAUMGARTNER:  Thank you, Your Honor.  This is

6    Justin Baumgartner for the Trustee.  I would just sum up.  All

7    this fraud or most of this fraud occurred before the Chapter 7

8    Trustee before we even got appointed in this case.

9          Mr. Perrault Jean-Paul impersonated an officer of

10   this court, for electronic filing privileges and then filed

11   various documents, and that's the whole reason this got to us

12   in the first place, and then once it did get to us, we

13   proceeded to do our job, and we've looked at the two properties

14   for sale, we put insurance on them, and the Trustee paid for

15   that.

16          So, we've already expended substantial efforts in

17   this case based on, you know, the past -- what's happened.  The

18   past law of this case.  So, we think there's no reason for this

19   case to be dismissed.  We think that it's a really -- a lot of

20   bad faith and potentially fraudulent conduct on the part of the

21   debtor's principal and definitely Mr. Perrault Jean-Paul and

22   we'd like to proceed.

23          THE COURT:  Okay.  All right.  Ms. Jahn?

24          MS. JAHN:  Thank you, Your Honor.  This is Hannah

25   Jahn.  The City of Milwaukee has been in good contact with the

1  Trustee, and we agree with their method of moving forward in

2  this case.  We believe that this case would best satisfy the

3  interest of the City of Milwaukee in collecting its debts.

4        As you can see from the letter that the City filed

5  with Mr. Baumgartner, the City has been unsuccessful in moving

6  these cases forward in Milwaukee County Circuit Court despite

7  our best efforts, and so it appears to me the bankruptcy case

8  would be the best way to resolve these issues quickly.

9        THE COURT:  All right.  But, Ms. Jahn, so you're

10  saying you're opposing the dismissal and want the case to

11  continue in Chapter 7?  Is that basically it?

12        MS. JAHN:  That is correct, Your Honor.

13        THE COURT:  And then I'm a little -- I know there is

14  a tortured history, but I'm a little unclear on exactly where

15  it stands, because it looks like you have a judgment for

16  79,728, which includes interest at 4.5 percent, but Ms. Bolivar

17  indicates that there has been a proceeding by Mr. Perrault to

18  somehow vacate that judgment, or do you consider that --

19        MS. JAHN:  Yes, Your Honor.  So, the judgment that

20  the City has is against Mr. Perrault Jean-Paul himself, and the

21  way that Supportive Health got involved in the Milwaukee County

22  case is, as stated in our letter, the City obtained the

23  judgment against Mr. Jean-Paul, just a matter of like a few

24  days or weeks after he transferred his property to Supportive

25  Health in 2016.

1            And so in the 2017 collection matter, the City named

2  both Mr. Perrault and Supportive Health as parties under the

3  assumption that it was a fraudulent transfer for the purpose of

4  avoiding paying the debts, and so we do not have a judgment

5  against Supportive Health, per se.  It's just that we believe

6  that it's wrapped up in that fraudulent transfer, and so,

7  therefore, they were included as a party in the 2017 lawsuit,

8  which is --

9            THE COURT:  And so, that -- is that the one where

10  there is proceedings to -- I don't know.  My question was is

11  the judgment that you have just against Perrault Jean-Paul is

12  79,000, is there a proceeding to vacate that or otherwise

13  modify that or is that still in effect?

14            MS. JAHN:  Technically, yes.  For the 2016 case, the

15  judgment is issued against Mr. Jean-Paul himself, and there's

16  also a lien placed on the property.  And when those properties

17  were transferred via quitclaim, we believe the lien is still in

18  place against those properties, even though they had

19  transferred ownership.  So, the 2016 case, Mr. Jean-Paul filed

20  multiple motions to reopen, which were unsuccessful.  Two

21  different circuit court judges denied those motions to reopen.

22  He did not appeal that case.

23            Instead, he's been active in the 2017 lawsuit, which

24  is the City's collection case, in bringing up his defenses to

25  collection in that matter, and then even while that case was

1  open, he filed a 2020 lawsuit against the City of Milwaukee

2  essentially asking the Circuit Court to vacate the prior

3  judgment, so we called that our collateral attack case.

4          It is a -- I mean, technically, it's possible in

5  state law to do such a thing in certain circumstances, but the

6  -- in the City's position that is a matter that is completely

7  barred by claim preclusion, and so our motion to dismiss in

8  that case is still pending.

9          So, yes, he is still -- Mr. Jean-Paul is still

10  disputing the City's judgments, but from the City's

11  perspective, it is a final judgment, and it's not -- it's not

12  likely that -- from our position, that he's going to be

13  successful in overturning that judgment.

14          THE COURT:  Then what about this promissory note from

15  Supportive Health in Jean-Paul Perrault?  Is that still --

16          MS. JAHN:  Your Honor, that was --

17          THE COURT:  Is that still in effect?

18          MS. JAHN:  That was -- I'm not personally aware of

19  the status of that.  I think that might be a better question

20  for Ms. Bolivar, but the City's contract counsel who's handling

21  the 2017 lawsuit did depose Mr. Jean-Paul, and that's what

22  affects come regarding that -- regarding that promissory note.

23          And so at that time, it was presented to Mr. Jean-

24  Paul that the dates didn't line up, and there was some question

25  on the part of the City as to the voracity of that document,

14

1 but no court has yet made a finding as to that document.  I

2 don't know if that answered your question.

3         THE COURT:  Yes.  Okay.  But, anyway, there's a

4 promissory note for Supportive Health to provide 61,500 to Mr.

5 -- $61,500 to Mr. Jean-Paul for the purchase of the Eden Place

6 property, but -- okay.  But that's the property he also

7 transferred to Supportive, so, all right.  Ms. Bolivar, do you

8 have any --

9         MS. JAHN:  Your Honor, just quickly.

10         THE COURT:  Go ahead.  Go ahead.  I'm sorry.

11         MS. JAHN:  Oh, I'm sorry.  I think -- and I don't

12 want to testify, but I'm just trying to be helpful to the Court

13 by providing the facts as we believe them, but I think relative

14 to those issues would be the quitclaim deeds and the real

15 estate transfer (indiscernible) that are attached to the City's

16 letter.  I mean, that indicates the buyer and seller of the

17 property and how it was recorded as a -- the related party

18 transfer.

19         THE COURT:  Right.  Right.  Okay.  Ms. -- do you say

20 it Jan or John, or how do you pronounce that?

21         MS. JAHN:  It's Jahn (pronouncing).  It's like John

22 with a Y.

23         THE COURT:  Jahn.  Oh, okay.  So just -- I'm not sure

24 why the letter came through the Trustee, but you're certainly

25 welcome to file papers directly with the Court.

15

1          I know it was -- it says at the beginning of the

2   letter to the -- it's to the Trustee and -- but it's to provide

3   the Trustee and the Court with a background, but you could --

4   you know, you can file papers directly, and I won't -- you

5   know, I invite you to do so.

6          So, Ms. Bolivar, do you want to respond to any of

7   that?

8          MS. BOLIVAR:  Yes, Your Honor.  So it's clear that

9   the case must be dismissed, because Mr. Jean-Paul, he's not an

10  attorney.

11          THE COURT:  Well --

12          MS. BOLIVAR:  Okay.  Dismiss -- this bankruptcy was

13  filed in bad faith, and it's unauthorized -- unauthorized by a

14  third party.  It wasn't authorized and not by me.  I should not

15  be penalized for that.  I should not be penalized for it, Your

16  Honor.

17          THE COURT:  Well, okay.  I guess you don't want to

18  address that other than to say that you didn't sign those

19  letters.  You don't want to address those letters that you said

20  the exact opposite.

21          MS. BOLIVAR:  Your Honor, the case was not filed by

22  an attorney.

23          THE COURT:  Yes.  You see, that's what I was trying

24  to get at before, that it looks like there's an attempt to

25  benefit from a fraud that was being perpetrated.  All right.

16

1          This matter is before the Court on a motion filed by

2  Ms. Carline Bolivar, the debtor's asserted principal and one

3  hundred percent owner, to dismiss this case under 707(a) on the

4  grounds that the filing was not properly authorized and was

5  made by an unauthorized filer.

6          And then also there's a motion filed by the Chapter 7

7  Trustee, Eric Perkins, to compel the current tenants of one of

8  the debtor's real properties and Mr. Jean-Paul Perrault -- I

9  thought -- is it Jean-Paul Perrault or Perrault Jean-Paul?  I'm

10 not clear on that.  I thought is was Jean-Paul Perrault.

11         Well, I'm going to call him Perrault -- to turn over

12 any rents that he has received from the debtor's property

13 post-petition and a cross motion by Ms. Bolivar to stay the

14 turnover motion until the motion to dismiss is decided.

15         Well, I can dispose of that very quickly, as

16 indicated, because they are heard at the same time, so that is

17 moot.

18         The parties in interest have filed objections and

19 replies to the motion to dismiss.  Ms. Bolivar filed the

20 limited objection to the motion for turnover on the ground that

21 it should not be heard of -- ahead of the motion to dismiss,

22 and also today submitted a copy of her passport, that the Court

23 has and has reviewed, and it's another -- it is another

24 document that indicates signatures do not match, but, well,

25 I'll deal with it.

17

1          The debtor filed this voluntary case as a Chapter 11

2    on June 22nd, 2021, almost five months ago, over the electronic

3    signature of Carline Bolivar, who has indicated is the -- is

4    asserted to be the debtor's one hundred percent owner, pursuant

5    to an operating agreement that was submitted with Ms. Bolivar's

6    affidavit -- certification.

7          The case was allegedly filed by the Lento Law Group

8    as its counsel, but they subsequently indicated that various

9    documents were filed on its behalf, using its electronic I.D.

10   without its authorization, so they were permitted to withdraw

11   on the grounds of a very, very serious conflict with the

12   client.

13         The debtor's primary assets are two real properties

14   in Wisconsin, one at 229 East Eden Place in St. Francis,

15   Wisconsin -- I'll call it the Eden Place or St. Francis

16   property -- and 3629 South New York Avenue, Milwaukee,

17   Wisconsin.  That's the Milwaukee property, collectively of the

18   -- and collectively refer to them as the properties.

19         The debtor filed as a single-asset real estate

20   entity, initially, a small business, and as a Subchapter 5, but

21   amended its schedules on July 11th to designate itself as a

22   small business.

23         The debtor scheduled the St. Francis or Eden Place

24   property but not the Milwaukee property and has not amended its

25   schedules to date to include the property, although Ms.

1  Bolivar's certification does seem to indicate that there are

2  other properties that are not accounted for on the debtor's

3  schedule.

4      The Trustee conducted a site visit to both properties

5  on October 13th, 2021 and noted that there was a tenant at one

6  of the properties.  The petition lists the debtor's operating

7  address as 72 Van Reipen Street, #353, in Jersey City, and the

8  only other scheduled assets were $2,400 about in cash and

9  $1,300 in accounts receivable.

10     The Court notes that a meeting of creditors was

11  originally scheduled for August 4th, '21 then rescheduled for

12  August 11th of '21 and then again for September 1st, all

13  apparently by or purportedly by debtor's counsel, but later it

14  was determined that debtor's counsel had not made those

15  filings, that they were instead made by Mr. Perrault using

16  those -- using their I.D. information.

17     The case -- about two months after the case was filed

18  on August 11th and 12th, the Trustee filed an order -- a

19  request for an order shortening time for hearings to convert or

20  dismiss the case on various grounds but not just the lack of

21  insurance, but that the docket was corrupted, the case was

22  corrupted by unauthorized filings by Mr. Perrault and the

23  request for shortened time was made.  A hearing was held on the

24  12th to schedule those matters, and it was scheduled for the

25  19th.  No one attended on behalf of the debtor at those

hearings, even though they were all noticed and invited to attend on the 12th and the 19th.

The U.S. Trustee discovered, by independent research, that Ms. Bolivar and Mr. Perrault share a residence, 85 -- at 85 Sycamore Road in Jersey City, New Jersey, and that's another fact that has not been denied by Ms. Bolivar or Mr. Perrault and is also confirmed really by papers filed with the Court and Ms. Bolivar also uses the Van Riepen Road address for the letters.

Mr. Perrault was the original owner of both properties.  He apparently purchased the St. Francis property on December 7th, 2012 and transferred it to the debtor by quitclaim deed on February 17th, 2016 just as the City of Milwaukee was obtaining a judgment against him and the property, which a judgment was ultimately entered.  The property was scheduled with a value of $182,000.

Then there was the Milwaukee property that was purchased in 2003 by Mr. Perrault and transferred to the debtor by quitclaim deed on February 17th, 2016.  Both the transfers were for no consideration.  Again, none of that has been denied or any contrary proofs offered by the debtor.

As a result of the certifications and other evidence presented at the August 2, 2021 hearings, it was determined that Mr. Perrault had electronically filed the petition himself with credentials he had obtained from the Lento Law Group and

1 even though the Lento Law Group had been paid some monies for

2 the filing and acknowledged as much.

3       Then the U.S. Trustee also noted in its original and

4 supplemental submissions that Ms. Bolivar had not provided

5 proper identification to the U.S. Trustee to allow her to

6 provide testimony for the debtor at the meeting of creditors in

7 an initial test -- in an initial debtor interview, and that her

8 signature on the corporate resolution appeared to be different

9 from the signature on two Wisconsin State Court documents, and,

10 as pointed out in the -- those are documents evidencing various

11 transfers with the same property involving Mr. Perrault.

12       So, at the conclusion of the August 19th hearing, the

13 Court converted the case to one under Chapter 7 and also

14 entered the order for conversion on August 19th, 2021.

15       The Court denied the retention application of the

16 Lento Law Group, which sought to withdraw from representation

17 by also order entered on August 19th on the basis of the basis

18 of the improper filings by Mr. Perrault.

19       As I started out these proceedings in connection

20 with both those matters, Ms. Bolivar sent emails to the Court

21 on August 19th with a letter dated August 13th -- August 18th,

22 2021 on Supportive Health letterhead that says Supportive

23 Health has been made aware that the bankruptcy filing is in

24 jeopardy of being dismissed because of ineffective counsel.  So

25 here -- there Ms. Bolivar's expressing concern that the case

1 will be dismissed, and now she's asking for the case to be

2 dismissed.

3 　　　　Given the money and time that Supportive Health has

4 already invested towards the bankruptcy, it would -- now Ms.

5 Bolivar is claiming that the bankruptcy was unauthorized, but

6 in her August 18th letter she's saying that the money and time

7 has been invested towards the bankruptcy, and then again it

8 would not be just to dismiss the bankruptcy.  So, arguing that

9 the bankruptcy should be kept in place and just asking for

10 another 30 days to retain counsel, she -- that would put us

11 into around September 19th.  No counsel was retained.  Ms.

12 Bolivar indicates that she was looking for counsel, and no one

13 would agree to represent the -- Supportive Health.

14 　　　　Then also on October 13th, Ms. Bolivar wrote to the

15 Court again on the Supportive Health's letterhead that the

16 Lento -- about the inability to find an attorney, but in there

17 she also said -- but she's looking for an attorney to represent

18 Supportive in the case.  Again, completely contradictory with

19 the notion that the case was -- the filing itself was not

20 authorized.

21 　　　　And then the second paragraph says, the case was

22 initially filed as a Chapter 11 bankruptcy to give Supportive

23 Health LLC an opportunity to restructure its debt.  Nothing

24 wrong with that.  That's what Chapter 11 filings are for.

25 　　　　The problem with the -- the problem arises from the

1  position that is now being taken that the filing was

2  unauthorized, and this letter signed by Ms. Bolivar indicates,

3  again, directly the contrary.

4          So, then also conspicuously absent from the

5  submissions that -- made by Ms. Bolivar is any mention of her

6  relationship with Mr. Perrault, even though they live at the

7  same address, even though Mr. Perrault transferred his

8  properties to Supportive Health for, apparently, no

9  consideration, even though Ms. Perrault [sic] claims she

10  contributed 366,000 to Supportive Health when the properties

11  had already been conveyed for no consideration.

12          All these things caused a great deal of concern and

13  pause by the Court and in -- and a real concern that another

14  fraud is attempting to be perpetrated on the Court.

15          As noted above, the Trustee paid a site visit to the

16  Wisconsin properties on October 13th and filed a notice of

17  assets on the 14th and applied for a realtor to -- to retain a

18  realtor to sell both properties.  The Trustee noticed that

19  there was a tenant at the St. Francis property and communicated

20  with that tenant in order to have the rents turned over to the

21  estate.

22          I should note again in that October 13th or 14th

23  letter Ms. Bolivar said she wants more time to obtain an

24  attorney, another 30 days.  That would put us into November and

25  there was no attorney retained, and that the debtor disputes

23

1  its debt to the City of Milwaukee.

2        Now, the debtor -- you know, the debtor disputes its

3  debt, but, really, the debt arises from a claim against Mr.

4  Perrault, and the judgment is against Mr. Perrault making the

5  absence of Mr. Perrault from any of Ms. Bolivar's papers, which

6  were prepared in a manner that they would be prepared by a

7  lawyer, more in doubt.

8        Bolivar, again, as noted, nowhere in her August or

9  October submissions to the Court did she indicate that the case

10  should be dismissed as an unauthorized filing, and, also, Ms.

11  Bolivar refused to submit to a 341 meeting, and the Trustee's

12  demand for documents, again, no dispute as to that.

13        On November 2nd, Ms. Bolivar moved on behalf of the

14  debtor, apparently without counsel, although, as I note, the

15  papers appear to have been prepared with the assistance of

16  counsel to dismiss the case on the grounds that she did not

17  review the petition or authorize its filings.

18        Ms. Bolivar appears to be the one hundred percent

19  owner of the debtor, although what remains unclear is why Mr.

20  Perrault would have contributed to properties to the debtor for

21  no consideration without some kind of ownership interest and

22  why all the dealings with the property, including not just the

23  City of Milwaukee but also the tenants, are with Mr. Perrault.

24  In fact, the lease is with Mr. Perrault.

25        As noted, Ms. Bolivar attached to her motion the

1  debtor's August 8th operating agreement indicating a principal

2  place of business of 85 Sycamore Road in Jersey City, which is

3  Ms. Bolivar's residence with Mr. Perrault, and then that 72 Van

4  Reipen Street address in Jersey City of the registered agent,

5  that's the address also that appears on the petition.

6        The operating agreement indicates that the sole

7  member and manager was Roderick Sanders, who contributed

8  $25,000 in capital while Ms. Bolivar contributed 366,000.

9  Again, that's a lot of open questions there as to how that all

10 occurs.

11       But, anyway, it appears that at least it's asserted

12 now that Ms. Bolivar is this debtor's sole owner, but it's

13 unclear how that happened or how or what was the reason for the

14 transfer of the two properties to Mr. -- for Mr. Perrault to

15 the debtor if for no consideration other than the -- what City

16 of Milwaukee says, which was to attempt to avoid the collection

17 of the judgment against Mr. Perrault.

18       Ms. Bolivar states she's been unable to obtain

19 bankruptcy counsel because of the history of the case.  That

20 she is the creditor of the debtor, however, as we pointed out

21 at the beginning of this hearing, she herself indicates she's

22 an equity holder, and her investment in the debtor, which makes

23 her an interest holder not a creditor, said she was not aware

24 when the debtor acquired the properties from Perrault that they

25 were subject to municipal liens, and that she has chronic

1  health issues that require treatment and leaves her bedridden

2  and did not have a chance to review or sign the petition before

3  its filing and was not aware of its contents.

4          Apart from those positions, Ms. Bolivar's

5  certification contains many contradictory statements about the

6  extent to which knew about the bankruptcy and what she wants to

7  do with the debtor, and she says in Paragraph 18 she was not

8  privy to the filings and was not aware of any deficiency in the

9  filings, which is directly contradicted by her August and

10 October communications to the Court.

11         On August 22nd, to my surprise, I received notice

12 from the Lento Law Group that it was withdrawing from the case,

13 also contradictory to the claim that the filing wasn't

14 authorized.  What that indicates is that the Lento Law Firm was

15 authorized to do the filing, and she was surprised that it was

16 withdrawing from the case, that the Lento -- again, confirming

17 that Paragraph 23, the Lento Law Group -- the Lento Group was

18 hired to deal with stress of bankruptcy Chapter 11, so I can

19 reorganize the debt of my company and reduce stress.  Again,

20 completely contradictory.

21         Then also argues that because the Lento Law Group did

22 not file the petition, it should be dismissed, but that was --

23 that issue was really raised at the beginning of the case in

24 offense and that the reason for the Trustee's motion -- the

25 principal reason for the Trustee's motion in addition to the

1  insurance, which now apparently is in place either through the

2  debtor or the trustee or both, that they were unauthorized

3  filings.

4        There was an attempt to do the bankruptcy filing and

5  then for whatever reason, the -- Mr. Perrault went around the

6  Lento Law Group and, therefore, was allowed to withdraw, and

7  the Chapter 7 Trustee was appointed.

8        Ms. -- despite again what was said at the beginning

9  of the hearing by Ms. Bolivar, she says the debtor has the

10  ability to repay its actual debt in full right now, but there's

11  no proof of that.  There's no papers, no bank accounts, no

12  anything, unless there are things that weren't disclosed in the

13  petition, and she -- and then again, in Paragraph 34 it kind of

14  in concluding the debtor should be given an opportunity to file

15  a new Chapter 11 bankruptcy with competent legal

16  representation.

17        So, you know, the -- let's just disregard all that

18  happened before, make believe it didn't happen, and then file a

19  new case that at some point in the future undetermined.

20        And she also complains that the -- that there are

21  unidentified assets, which she -- that she should have

22  supplemented when she should have provided to the Trustee but

23  refused to do so either in documents or appearing at the 341,

24  and she complains that the Lento Group did not perform the

25  services for which it was hired, which was to file the

1  bankruptcy petition.

2       The Trustee filed a short -- filed objections on

3  November 30th and December 3rd, 2021, that the -- with the

4  December 3rd letter, including a letter from city council for

5  the City of Milwaukee, explaining its long history with the

6  debtor, Perrault, and even Ms. Bolivar with respect to

7  notarization of various documents relating to the property.

8       The City indicates that Mr. Perrault is the owner of

9  the St. Francis property, incurred certain municipal charges,

10 and -- on several Wisconsin properties, and after the City

11 filed a complaint against Mr. Perrault, he transferred the

12 property to the debtor, after the -- the City filed a complaint

13 in January of '16.  He transferred the property to the debtor

14 for no consideration on February 17th, 2016 by quitclaim deed,

15 money judgment was obtained on 61 -- for 61,624.29 against Mr.

16 Perrault in March of '16, and then there was a foreclosure

17 action when -- after the City learned of the transfer to the

18 debtor in November of 2017 against the -- Mr. Perrault and the

19 debtor.

20      The City notes that Ms. Bolivar notarized at least

21 three documents related to the St. Francis property in 2012,

22 '16, and '18, with a notary stamp that perpetually stated

23 expired in September of 2019, even though notary stamps in New

24 Jersey are generally good for five years -- only five years,

25 and the money judgment is now at 79,782, which the debtor

1  scheduled at a higher number.

2        Again, Ms. Bolivar argues that the case should be
3  dismissed as an unauthorized filing, that she did not sign the
4  petition of schedules, and she can't continue without
5  representation through counsel, although that is addressed in
6  many ways by the Trustee being in place and safeguarding the
7  property of the estate for the benefit of creditors and to the
8  extent there's equity interest holders.

9        The -- as indicated, I -- the Court finds that the
10 statements that the filing was unauthorized are repeatedly
11 contradicted by Ms. Bolivar's own statements and actions and
12 appear to be a new version of events created for -- to support
13 the dismissal.  There is simply no way the Court can dismiss
14 the case under those standards -- under those circumstances.

15        The Trustee cites In Re Jong Hee Kang, 467 B.R. 327
16 at 335, which provides that the right to dismiss under 707(a)
17 is not an -- is not absolute and the debtor must establish
18 cause.  The overarching concerns are good faith of the debtor
19 and prejudice to creditors.

20        There's another standard, In Re Turpen.  Set forth in
21 In Re Turpen, 244 B.R. 431 at 434, Bankruptcy Appellate Panel,
22 8th Circuit (2000), which has a six-factor test to determine
23 whether to grant voluntary dismissal of a Chapter 7 case, which
24 is -- separates a lot of what's in the Jong Hee Kang test, but
25 whether all creditors have consented, that the answer to that

1  is no.

2         Milwaukee wants the case to continue in Chapter 7,

3  whether the debtor is acting in good faith.  That's in both --

4  a factor in both cases, and I have no ability to find the

5  debtor's acting in good faith.  I do see many indices of bad

6  faith, and I don't -- and I'm not going to have our courthouse

7  and our court used for those types of purposes.

8         Whether dismissal may result in prejudicial delay to

9  payment of creditors, it seems like that's the purpose of this,

10 that's been going on since 2016, five years, to delay the

11 payment to the City of Milwaukee.

12        Whether the dismissal would reorder creditor

13 priorities, it would have no effect, so that's not applicable.

14        Whether there's another proceeding to which creditor

15 claims could be handled.  There is the Milwaukee case, but

16 that's been stalled for years by motions for reconsideration

17 and vacating judgments, now this bankruptcy.  So that's

18 neutral.

19        Whether the debtor moved for dismissal on the face of

20 pending litigation.  Here there's an application to turn over

21 the rents, and the debtor's moving after having received the

22 benefit of the stay and invoking the Bankruptcy Court's

23 jurisdiction under -- with the prior filing, which Ms. Bolivar,

24 I find her statements in her letters, even though she indicates

25 now she didn't send them, to be directly contradictory, and I

1  just -- I'm not -- I have no way to determine that those are

2  letters that weren't sent by her, although if they were sent by

3  Mr. Perrault, they would certainly -- at least a possibility

4  that it was done knowingly, and again, the omission of Mr.

5  Perrault from Ms. Bolivar's papers, as they say, the silence

6  speaks volumes.

7         Further, the debtor has a duty to disclose and

8  correct the schedules under 521(a), and she has refused to do

9  so.  So, that's more evidence of bad faith.

10        So, in this case, all those factors militate against

11  dismissal under the two tests I cited, but I'm also holding

12  that the debtor is equitably estopped from disavowing the

13  petition, because the debtor retained certain benefits of the

14  bankruptcy or may be deemed to retroactively have ratified the

15  petition through the bankruptcy case.

16        And for that I cite In Re Willis where a debtor was

17  alleged to -- a debtor's Chapter 13 case was alleged to have

18  been filed without a signature and -- but, however, the

19  creditor began filing stay relief motions, which the debtor

20  opposed, and a motion to dismiss and convert was filed, which

21  was granted.

22        And so -- and the debtor moved to reconvert to

23  Chapter 13, so the Court said, even when she moved to dismiss

24  and they're -- saying she never authorized the position or the

25  conversion of the case, the debtor -- the Court denied the

1 dismissal, and the debtor appealed.  That's 345 B.R. at 649 to

2 650.

3        And the -- on the appeal, the Bankruptcy Court -- the

4 District Court -- I'm sorry -- the Appellate Panel affirmed the

5 denial of the debtor's motion to dismiss finding she was

6 collaterally -- the debtor was collaterally estopped from

7 rejecting the petition after she waited six months to make an

8 issue of the unauthorized filing, received the benefit of the

9 stay, and had made submissions to the Court without addressing

10 the alleged unauthorized nature of the petition and generally

11 manifested a disrespect to creditors, all of which appear to be

12 present here or are present here.

13        And, similarly, In Re Segal, 527 B.R. 85 at 88

14 Bankruptcy Eastern District of New York (2015), appeal

15 dismissed 557 B.R. in 2016, the debtor -- the Bankruptcy Court

16 denied the debtor's motion to dismiss a Chapter 7 petition that

17 he did not sign, but his attorney electronically signed for him

18 to -- so as to prevent a foreclosure sale.

19        The trustee began to investigate the asset, requested

20 documents, and moved to sell the debtor's property.  The debtor

21 then moved -- objected and attended a sale hearing but still

22 didn't tell the Court that he believed the petition should be

23 dismissed as unauthorized.  The debtor was also ordered to

24 comply with his duties as a debtor, but the debtor refused to

25 do so and then moved to dismiss.

32

1        The Bankruptcy Court determined the debtor did not

2  authorize original counsel to place them in bankruptcy, and

3  that  but, nonetheless, the debtor ratified the petition by

4  voluntarily signing an amended petition and participating in

5  the case, and that the debtor was equitably estopped from

6  denying the petition, because he tended to reap the benefit of

7  any stay to prevent a foreclosure sale, and the Trustee

8  expended substantial resources in administering the case before

9  the debtor moved to dismiss.  527 B.R. at 93.

10        Here, there is similar lapses that -- there's been

11  about four months from the petition date to the motion to

12  dismiss, and here those factors are very much present in all of

13  them.  There's -- as the case has been pending for five months

14  before the unauthorized filing was alleged.  There are numerous

15  prior indications that the filing was, in fact, authorized and

16  -- including statements by Ms. Bolivar herself and the

17  relationship between Ms. Bolivar and Mr. Perrault.  So for all

18  those reasons, the Court is denying the motion to dismiss.

19        The only opposition to the Trustee's turnover motion

20  was that it should await the dismissal -- the dismissal motion,

21  which we now have done, and other than that, there's no

22  opposition.  And, as I noted, the lease is with Mr. Perrault

23  not the debtor, so further demonstrating the very close

24  relationship between Mr. Perrault and the debtor's St. Francis

25  property.

1          There's a 12-month residential lease commencing on

2  March 1st and expiring on February 28th, 2022, in which Patrick

3  and Jennifer Newbury are lessees.  The Trustee argues that the

4  lease should be deemed void ab initio and that  the rent should

5  be turned over to the Trustee.

6          I don't know why the lease would be deemed void ab

7  initio, and, certainly, the Newbury's, you know, should -- had

8  no knowledge of any or there's no indication that they had any

9  knowledge of this, but I do agree that the rent should be

10  turned over to the Trustee as property to the estate.

11          The Trustee indicates that he advised the tenant of

12  the Trustee's position in October, and that the tenant agreed

13  to turn over but asked for a court order to protect the

14  Newbury's from Mr. Perrault attempting to file an eviction

15  action for non-payment, and that the Trustee also seeks to turn

16  it into a short-term use and occupancy agreement.  That the

17  Trustee can do in his discretion subject to, you know, whether

18  the Court approval is acquired -- required.  I'm not going to

19  say that.  It seems like it might be in the ordinary course but

20  might as well -- if the Trustee is entering into a new

21  agreement, might as well just submit it to the Court for

22  approval.

23          The Trustee is going to continue to market the

24  property but not close the sale until after the debtor -- the

25  Newbury's tenancy is terminated, and, you know, there's clearly

34

1  -- the rents are property of the estate under the broad

2  definition of property of the estate of -- under 541, and

3  therefore, they should be turned over to the Trustee.

4         That's the Court's ruling.  Mr. Baumgartner, the --

5  you have submitted an order.  Can you -- well, we'll do the

6  order denying the motion to dismiss for the reasons set forth

7  on the record.  I might have some small changes to the form of

8  order that you submitted just by way of just clarifying

9  changes, and that's it.  That's the Court's ruling.

10        MS. BOLIVAR:  Excuse me --

11        MR. BAUMGARTNER:  Thank you, Your Honor.

12        MS. BOLIVAR:  -- Your Honor?

13        THE COURT:  Yes?

14        MS. BOLIVAR:  Hello?

15        THE COURT:  Yes.

16        MS. BOLIVAR:  Excuse me, Your Honor.

17        THE COURT:  Yes.

18        MS. BOLIVAR:  May I say something?

19        THE COURT:  Yes.

20        MS. BOLIVAR:  I can pay the debt that's due.

21        THE COURT:  Yes, well --

22        MS. BOLIVAR:  I would like maybe to pay the debt --

23        THE COURT:  Yes.

24        MS. BOLIVAR:  -- to avoid any further complication or

25  liquidation.

1        THE COURT:  Yes, so --

2        MS. BOLIVAR:  I am (indiscernible), sir, and I would

3  like to be left without -- you will leave me without any source

4  of my livelihood.

5        THE COURT:  Well, so, here's the thing, Ms. Bolivar.

6  As I noted, you said that, but you didn't provide any proof of

7  that, and, certainly, if you want to pay the debts, but there's

8  going to be administrative expenses of the Trustee in the

9  interim, you can do that.

10        There's no problem with doing that, and, you know,

11  then the creditors might consent that there might -- but you

12  should talk to the Trustee about that.  Just -- you know,

13  that's what the -- the Trustee is in control of those

14  properties now.  So, you know, you can -- and you can still get

15  yourself an attorney, and you can still -- that attorney can

16  move to do whatever they want to do, but you can get an

17  attorney for yourself, you know, personally if you're having

18  trouble with getting attorneys to represent this debtor, which,

19  you know, is not -- I'm not completely shocked that -- to hear

20  you say that, because there's a very bad history here.

21        So, you know, you can -- like I said, you can pay it

22  -- you can always pay your debts.  There's no problem with

23  paying debts, and if you have the means to do so, then that's

24  up to you, and you should go ahead and either talk to the

25  Trustee or get an attorney to talk to the Trustee, and take

36

1 care of it.  Okay?

2 MS. BOLIVAR:  Your Honor, what about the disputed

3 debt?

4 THE COURT:  Well, I mean, the disputed debt -- you

5 know, there's a judgment.  I don't know.  I don't know what to

6 say.  You know, the -- it's -- I don't know what debt you're

7 talking about paying then.  What debt are you going to pay?

8 MS. BOLIVAR:  Everything minus 80,000.

9 THE COURT:  But what is everything?  I don't even

10 know what it is.  I don't know who all the creditors are.  I

11 don't -- and I don't know what the basis is, is not to pay the

12 pay the City of Milwaukee.  I don't know, and that would

13 contribute to, you know, whether it -- that would contribute to

14 whether the dismissal would be appropriate.

15 In other words, generally speaking, if a debtor pays

16 all its debts, that would probably be a good reason to dismiss

17 the case, but if it doesn't, then the creditor whose not going

18 to be paid is going -- likely to object, so then you end up

19 staying in the bankruptcy.

20 MS. BOLIVAR:  Your Honor, Milwaukee is the only

21 creditor in the case.

22 THE COURT:  Well, I don't know that.  There's also a

23 law firm that's a creditor.  I just don't know.  I don't know.

24 MR. BAUMGARTNER:  Your Honor --

25 MS. BOLIVAR:  Your Honor --

37

1        MR. BAUMGARTNER:  -- the IRS filed a proof of claim

2 for 28,000.

3        THE COURT:  Who did?

4        MR. BAUMGARTNER:  The IRS.

5        THE COURT:  Yes, then the IRS filed a proof of claim,

6 so, you know, I think you need to -- like I said, you might

7 want to get an attorney to represent you in this, Ms. Bolivar.

8 I feel like you've been talking to an attorney, and maybe that

9 attorney will represent you instead of representing the entity.

10        MS. BOLIVAR:  Thank you, Your Honor.

11        THE COURT:  Okay.  Here's the thing.  You can't have

12 it every which way.  You got to make some decisions.  You can't

13 have it both ways.

14        You can't have the bankruptcy filing and then dismiss

15 it -- and then seek to dismiss it unless, you know, that you

16 meet certain standards.

17        You can't say you're going to pay all the debts and

18 then say you're not going to pay them.  You got to decide which

19 one it is.  Okay?

20        Thank you.  Have a good afternoon.

21                        *  *  *  *  *

22

23

24

25

38

**C E R T I F I C A T I O N**

 1        I, JOY K. BRENNAN  the assigned transcriber, do

 2 hereby certify the foregoing transcript of proceedings on CD,

 3 playback number 11:19:19 to 12:24:11, is prepared in full

 4 compliance with the current Transcript Format for Judicial

 5 Proceedings and is a true and accurate compressed transcript of

 6 the proceedings as recorded, and to the best of my ability.

 7

 8

 9 /s/ Joy K. Brennan

10 JOY K. BRENNAN

11 J&J COURT TRANSCRIBERS, INC.          DATE:  January 10, 2022