| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N. J. LBR 9004-2 (c)**<br><br>**BECKER LLC**<br>354 Eisenhower Parkway<br>Plaza Two, Suite 1500<br>Livingston, New Jersey 07039<br>(973) 422-1100<br>Attorney for Chapter 7 Trustee, Eric R. Perkins<br>Justin S. Baumgartner, Esq.<br>Email: jbaumgartner@becker.legal | |
| In re:<br><br>Supportive Health LLC,<br><br>                                    Debtor. | Case No. 21-15113-VFP<br><br>Chapter 7<br><br>Judge: Hon. Vincent F. Papalia<br><br>Hearing Date: |

**APPLICATION IN SUPPORT OF TRUSTEE'S MOTION FOR THE ENTRY OF AN ORDER (1) AUTHORIZING CHAPTER 7 TRUSTEE TO SELL THE DEBTOR'S RESIDENTIAL REAL PROPERTY LOCATED AT 3269 SOUTH NEW YORK AVENUE, MILWAUKEE, WISCONSIN FREE AND CLEAR OF ANY LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363(b) and (f); (2) AUTHORIZING PAYMENT OF REAL ESTATE BROKER'S COMMISSION FROM THE SALE PROCEEDS; (3) WAIVING THE STAY PURSUANT TO FED. R. BANKR. P. 6004(h); AND (4) FOR OTHER RELATED RELIEF**

Eric R. Perkins, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Supportive Health LLC (the "Debtor"), hereby applies to this Court for entry of an Order (1) Authorizing Chapter 7 Trustee to Sell the Debtor's Residential Real Property Located at 3269 South New York Avenue, Milwaukee, Wisconsin 53207 Free and Clear of any Liens, Claims, and Encumbrances pursuant to 11 U.S.C. § 363(b) and (f); (2) Authorizing Payment of Real Estate Broker's Commission from the Sale Proceeds; (3) Waiving the Stay Pursuant to Fed.

R. Bankr. P. 6004(h); and (4) for other related relief (the "Sale Motion") and in support thereof, respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Through the Sale Motion, the Trustee seeks authority to sell the Debtor's real property located at 3269 South New York Avenue, Milwaukee, Wisconsin 53207 (the "Property") to Spa Life Furnished Oasis, LLC (the "Purchaser") for the sum of $285,000.00 via a private sale.

2. The Property has been privately and publicly marketed by the Trustee's relator, Root River Realty, since February 27, 2023. Specifically, Root River Realty listed the Property on the Multiple Listing Service (MLS) and also marketed the Property to its network of private real estate investors and other local real estate brokers. The Property was listed in "as is" condition for the price of $199,900.00. After approximately one week of the marketing, twelve (12) parties made offers for the Property with the Purchaser ultimately submitting the highest and best offer. Accordingly, the Trustee has concluded in his reasonable business judgment that the sale of the Property to the Purchaser for the purchase price of $285,000.00 is in good faith and for fair value.

## JURISDICTION

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b) and § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O).

4. Venue of the Debtor's Chapter 7 case and this Motion is in the proper court pursuant to 28 U.S.C. § 1408.

5. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a) and 363(b) and (f) as well as Rules 2002(a), (c), and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## PROCEDURAL HISTORY

6. On June 22, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (ECF No. 1).

7. On August 11, 2021, the Office of the United States Trustee (the "UST") filed a Motion to Convert the Debtor's Case to Chapter 7 based on, among other things, non-debtor party Perrault Jean Paul, filing unauthorized and potentially fraudulent pleadings on behalf on the Debtor, thereby compromising the integrity of the Court's docket (ECF Nos. 22, 27).

8. On August 19, 2021, the Court entered an Order granting the UST's Motion to convert the Debtor's case to Chapter 7 (ECF No. 34).

9. Thereafter, on August 19, 2021, the UST appointed the Trustee to administer Debtor's Estate pursuant to Bankruptcy Code § 701 (ECF No. 35).

## FACTUAL BACKGROUND

10. On its bankruptcy petition, the Debtor lists the nature of its business as a "single property LLC" (ECF No. 1 at p. 6 of 13).

11. The sole real property listed on the Debtor's lists, schedules, and statements is the property located at 2229 E. Eden Place, St. Francis, Wisconsin (the "Eden Place Property"). The Eden Place Property was previously sold by the Trustee pursuant to an order of this Court approving said sale entered on November 9, 2022 (ECF No. 212).

12. The Debtor, likely due to the potentially fraudulent nature of this bankruptcy filing, did not list the Property on its lists, schedules, and statements.

13. Notwithstanding, public records provide that the Debtor holds title to the Property. These records reflect that Perrault Jean Paul purchased the Property on September 19, 2003 and then transferred the property via quitclaim deed to the Debtor on February 17, 2016. A quitclaim deed is attached hereto as **Exhibit A**.

14. Further, the Debtor, through its principal Carline Bolivar, confirmed that the Debtor is the owner of the Property as part of her Motion to Compel the Trustee to Abandon the Property, which the Court ultimately denied (ECF No. 91- Motion; ECF No. 129- Order Denying Motion).

15. Additionally, on December 8, 2021, the Court entered an Order, which provided, among other things, that the Property as well as all post-petition rents generated from the Property were property of the Estate.[1]

16. The Trustee's realtor, Root River Realty, advised the Trustee that the Property's value in its current condition was approximately $250,000.00 and that a listing price of $199,900.00 should result in increased interest and potentially an offer above Root River Realty's appraised value. This ultimately was the case with the Purchaser's offer of $285,000.00.

17. In valuing the Property at approximately $250,000.00, Root River Realty considered that the Property needed significant repair work, including foundational concerns, plumbing issues such as the dishwasher draining through a flexible plastic pipe through the floor

---

[1] On December 14, 2021, Ms. Bolivar filed a Motion to Reconsider the Rent Turnover Order (ECF No. 92). This Motion was denied by the Court on January 25, 2022 (ECF No. 130). Additionally, it should be noted that while Ms. Bolivar did not appeal either the Rent Turnover Order or the Order denying her Motion to Reconsider said Order, to date, each and every one of Ms. Bolivar's appeals of this Court's orders has been dismissed by the District Court. *See* ECF Nos. 177, 185, 186, 187, 188.

and running down into the floor drain of the basement, and water leaks coming from the roof.[2] Thus, the Root River Realty determined that the Property overall was in substandard condition.

18.  While the Debtor's schedules did not disclose the Property or whether there are any liens against it, the Trustee, by conducting a title search, learned that there is a mortgage on the Property held by PHH Mortgage Services (the "PHH Mortgage").

19.  PHH Mortgage has a first mortgage on the Property in the approximate amount of $112,244.70 as of October 7, 2022. The Trustee is in the process of requesting a payoff statement from PHH Mortgage to ascertain the updated payoff amount in order to be able to close on the transaction and fully pay of PHH Mortgage's secured debt.

20.  According to the Debtor's Summary of Assets and Liabilities and Schedule E/F, the Debtor has pre-petition general unsecured debts in the amount of $120,000.00 predominately consisting of debt owed to creditor The City of Milwaukee, Wisconsin (ECF No. 10 at p. 1, 15 of 38).

21.  On July 12, 2021, the IRS filed a general unsecured claim in the amount of $28,560.00 (Proof of Claim No. 1-1).

22.  On December 21, 2021, Ms. Bolivar filed a proof of interest for her cash equity in the Debtor in the amount of $366,000.00 (Proof of Interest No. 2-1).

23.  On January 7, 2022, The City of Milwaukee filed a general unsecured claim in the amount of $76,238.56 (Proof of Claim No. 3-1).

24.  In addition to these claims and interests, the Trustee has incurred significant administrative expenses in administering the Estate predominantly due to the voluminous amount of motions, objections, and appeals Ms. Bolivar has filed challenging the validly of this

---

[2] Indeed, the Trustee already expended $1,500.00 to repair the Property's roof at the request of the Occupants to prevent further leaking and water damage.

bankruptcy proceeding in one form or another. Accordingly, the funds raised from the sale of the Property will go to the Estate to pay unsecured creditors.

## **THE OCCUPANTS OF THE PROPERTY**

25. On October 13, 2021, the Trustee conducted a site visit to the Property. During this visit, the Trustee discovered that the Property was being rented and occupied by several tenants in two separate units. However, during the site visit, the Trustee was unable to make contact with said tenants or learn their identities.

26. Additionally, the Debtor, through Ms. Bolivar, deliberately refused to give the Trustee the names of any of the residents of the Property. Ms. Bolivar's refusal to disclose the residents of the Property was in direct contraction of the Court's Order Denying Ms. Bolivar's Motion to Compel the Trustee to Abandon the Property (ECF No. 129).

27. Specifically, this Order provided "that Ms. Bolivar shall cooperate with the Trustee's request to provide all relevant documentation relative to any and all real estate of the Debtor, including but not limited to, all mortgage documents, including without limitation, recent mortgage statements of all balances due, copies of leases for all real estate of the Debtor, and current bank statements of the Debtor."

28. Upon information and belief, Ms. Bolivar refused to give the Trustee information regarding the residents of the Property because Perrault Jean Paul continued to collect the rents from the Property's occupants despite the bankruptcy filing.

29. Accordingly, on or around November 9, 2022, the Trustee filed an eviction action in Wisconsin Circuit Court, Milwaukee County (the "Circuit Court") based on the non-payment of rent (the "Eviction Action"). Because the Trustee did not know the names of the residents, the Eviction Action complaint listed the defendants as John Doe.

30. Ms. Bolivar, as a member of the Debtor, filed several motions seeking to dismiss the Eviction Action, all of which were eventually dismissed by the Circuit Court. In fact, in one of her pleadings Ms. Bolivar even certified that she was a current tenant at the Property. This assertion and the accompanying lease provided by Ms. Bolivar was quickly discounted by the Circuit Court as not credible.

31. On January 27, 2023, the Circuit Court properly disposed of all of Ms. Bolivar's motions and pleadings and removed the stay of the Writ of Execution, which allowed the Trustee to proceed with evicting any occupants of the building through the county sheriff's office.

32. On January 30, 2023, Alexandria Lenz, one of the tenants of the Property, filed an emergency motion to dismiss the Eviction Action (the "Emergency Dismissal Motion").

33. At the January 31, 2023 hearing on her Emergency Dismissal Motion, Ms. Lenz advised the Circuit Court that her landlord Perrault Jean Paul had just informed her the day prior that the Eviction Action was filed and that she needed to immediately file a motion with the Circuit Court to stop it or she would be removed from the Property.

34. After hearing Ms. Lenz's statements, the Trustee, through undersigned counsel, and Ms. Lenz agreed to adjourn the hearing on the Emergency Dismissal Motion to give the parties time to discuss how the Eviction Action could be amicably resolved.

35. After speaking with Ms. Lenz, through counsel, the Trustee learned that the Property was occupied by Ms. Lenz and her husband, Joseph Lenz, as well as their children in Unit A and Mr. Damon Bruce in Unit B (collectively the "Occupants").

36. Specifically, Ms. and Mr. Lenz occupied Unit A of the Property pursuant to a twelve (12) month residential lease, which commenced on January 1, 2017 and expired on December 31, 2017 (the "Lenz Lease Agreement"). Mr. Bruce occupied Unit B of the Property

pursuant to a twelve (12) month residential lease, which commenced on July 1, 2019 and expired on June 30, 2020 (the "Bruce Lease Agreement").

37. The Trustee has asserted that the both the Lenz and Bruce Lease Agreements are void *ab initio* because these agreements were between Perrault Jean Paul and the Occupants, and the Debtor, as the owner of the Property as of on February 17, 2016, was not a party to these agreements. Thus, Perrault Jean Paul had no legal authority to enter into the Lenz and/or Bruce Lease Agreements.

38. On or around February 14, 2023, the Trustee entered into Use and Occupancy Agreements with Mr. and Ms. Lenz as well as Mr. Bruce. These agreements provided that the Occupants had a right to occupy their respective units in the Property until August 31, 2023 or until the Trustee sold the Property, at which point the agreements would automatically terminate. In exchange for the Occupants entering into their respective Use and Occupancy Agreements, the Trustee agreed to dismiss the Eviction Action.

39. As part of the Use and Occupancy Agreements, the Occupants are also required to pay their previous regular monthly rent amount ($1,200.00 for Mr. and Ms. Lenz and $850.00 for Mr. Bruce) directly to the Trustee as an occupancy payment.

40. The Use and Occupancy Agreements also provided that in the event that there is no damage or destruction to each occupant's respective unit or the exterior of the Property, beyond ordinary wear and tear, upon the Trustee closing on a sale of the Property, as authorized by the Bankruptcy Court, said occupant may file a proof of claim in the present bankruptcy case in the amount of his or her security deposit as provided by their original lease agreement with Perrault Jean Paul.

41. The Trustee agreed to include the above security deposit return provision in the Use and Occupancy Agreements because Perrault Jean Paul entered into the above-described lease agreements with the Occupants after transferring the Property to the Debtor; likely to avoid the City of Milwaukee's pending foreclosure action. Thus, because Mr. Jean Paul perpetrated fraud on the Occupants and continues to hold himself out as the alter-ego of the Debtor, the Trustee has made the determination that the only way the Occupants may be able to recover their respective security deposits is by filing a proof of claim with the Estate.

42. The Use and Occupancy Agreements are referenced in the sale contract between the Trustee and the Purchaser. Additionally, the sale contract provides that the Purchaser is purchasing the Property with knowledge of and subject to the Occupants' use and occupancy of the Property. As such, the Trustee is not seeking an order evicting the Occupants from the Property.

## TRUSTEE'S EFFORTS TO MARKET AND SELL THE PROPERTY

43. On May 25, 2022, the Trustee, through counsel, filed an Application for Retention of Root River Realty to serve as the realtor for the Estate (ECF No. 189).

44. On June 9, 2022, the Court entered an Order granting the Trustee's Application to retain Root River Realty (ECF No. 191).

45. As stated above, Root River Realty (the "Realtor") marketed the Property on the MLS as well as its network of private real estate investors and other local real estate brokers starting on February 27, 2023. There was near immediate interest in the Property from multiple buyers.

46. At the time it began marketing the Property, the Realtor estimated the Property in its current condition had a value of $250,000.00.

47. After approximately one week on the marketing, twelve (12) parties made offers for the Property with the Purchaser ultimately submitting the highest and best offer of $285,000.00.

48. The Purchaser's offer is an all cash offer with no financing contingency. As stated more fully below, the Trustee believes in his reasonable business judgment that the Purchaser's offer constitutes the highest and best offer for the Property.

49. The Property is currently in substandard overall condition and is in need of major repairs. As such, the value of the Property is predominantly in the land, which is located only a few blocks from Lake Michigan.

50. The Trustee asserts that a private sale of the Property to the Purchaser is in the best interests of the Estate as the sale will bring funds into the Estate while removing the carrying costs of the Property.

51. Notwithstanding this determination, the Trustee, as mandated by the Bankruptcy Code, welcomes and will consider all subsequent offers for the Property which in the Trustee's and/or Court's business judgment would constitute higher and better offers. However, it should also be noted that the sale agreement with the Purchaser contains an escalation clause, which provides that the Purchaser will raise its offer in $5,000.00 increments over the next highest offer up to a final offer amount of $350,000.00 in the event that any subsequent offers over $285,000.00 are received by the Trustee. Accordingly, the Trustee respectfully requests that any subsequent competing bidders with the ability to (1) immediately remit a 10% deposit of their offer amount to the Trustee; and (2) provide proof of funds evidencing its ability to close on the sale submit a competing bid to the Trustee for his consideration no later than forty-eight (48)

hours prior to the sale hearing. Notice of this Motion will also be provided to the Purchaser in the event it wishes to submit another offer above $350,000.00.

## TERMS OF THE SALE AGREEMENT

52. On March 14, 2023, the Purchaser and the Trustee executed an Agreement of Sale for the Property (the "Agreement"), a true and accurate copy of which is attached hereto as **Exhibit B**. The Agreement provides that the Purchaser shall purchase the Property for $285,000.00 (the "Purchase Price") pursuant to the terms and conditions set forth in the Agreement, and subject to the approval of this Court.

53. The pertinent terms of the Agreement are as follows:[3]

   a. The purchase price shall be $285,000.00.

   b. A payment in the amount of $5,000.00 (the "Deposit") shall be deposited with the Trustee and held in escrow in a non-interest bearing account within five (5) days of the Agreement.

   c. The balance of the Purchase Price shall be paid to the Trustee at closing by wire transfer or by certified, cashier's, or bank check.

   d. At Closing, the Trustee shall deliver to the Purchaser a Trustee's Deed, and any other instruments reasonably required by Purchaser or Purchaser's title insurance company; and Purchaser shall deliver to Trustee such documents or instruments as may be reasonably required to effectuate the Property's sale.

   e. Although the Trustee does not assume the risk for any material loss or damage to the Property; if prior to closing all or a substantial part of the Property suffers a material loss or damage due to fire or casualty or if all or part of the Property is

---

[3] References to the Agreement are qualified in their entirety by the Agreement itself and to the extent that there is any discrepancy between the descriptions of the sale contained herein and in the Agreement, the Agreement shall control. Capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement.

condemned or taken as a result of eminent domain the Purchaser may terminate the Agreement without further obligation and the subject deposit shall be returned to the Purchaser.

f.  The sale is subject to the occupancy by Alexandria and Joseph Lenz and their family in Unit A and Damon Bruce and his family in Unit B. The personal possessions of the above parties are not included in the sale.

g.  An order of this Court approving the sale of the Property must be issued prior to the Closing (the "Approval Order"). The Approval Order shall not be subject to any stay under Bankruptcy Rule 6004(h). In the event that an Approval Order or certificate of no objection is not issued within sixty (60) days of the date of the Agreement, either the Purchaser or the Trustee may terminate the Agreement by providing written notice to the other party and the Purchaser's deposit shall be returned.

h.  The sale is "where is" and "as is," and free of liens and encumbrances, with valid liens and encumbrances to attach to the proceeds of the sale.

i.  The Trustee is solely liable for any payment owed to the real estate broker he engaged in regard to the Property and Purchaser agrees to indemnify Trustee against and hold harmless from any loss, damage, cost or expense, including without limitation, attorneys' fees and disbursements, incurred as a result of any misrepresentation made by Purchaser.

j.  The Closing shall take place within fourteen (14) days following the entry of the Approval Order or, at some other commercially reasonably time as agreed upon by Trustee and Purchaser.

k.  The laws of the State of New Jersey shall govern the interpretation, construction, and performance of the Agreement.

l.  The Bankruptcy Court shall retain jurisdiction over any action relating to this Agreement.

m.  In the event of a default by the Purchaser, the Trustee shall have the right to avail himself of all rights and remedies available at law or in equity, including but not limited to retention of the Deposit.

n.  In the event of a default by the Trustee, the Purchaser, as its sole and exclusive remedy, shall be entitled to the return of the Deposit, and thereafter neither party shall have any further obligation to the other.

o.  The sale of the Property is subject to higher and better offers as determined by the Trustee or the Bankruptcy Court.

p.  In the event, the Purchaser is not selected as the ultimate purchaser of the Property and the Trustee instead accepts a competing offer and said competing offer is approved by an order of the Bankruptcy Court and subsequently closes, Purchaser shall be paid a break-up fee constituting any expenses actually incurred from the date of the Agreement until the Trustee notifies Purchaser that he has accepted a higher and better offer (the "Break-Up Fee").

q.  In order to receive the Break-Up Fee, Purchaser must file an application with the Bankruptcy Court specifically listing each expense actually incurred in contemplation of the Agreement and seeking an order of the Bankruptcy Court approving said expenses (the "Break-Up Fee Application").

## IV. RELEVANT TERMS OF THE LISTING AGREEMENT

54. On or about February 23, 2023, the Trustee and the Realtor, by and through sales broker Holly Speranza, executed a Listing Agreement for the Property. The Listing Agreement provides that the Realtor will be entitled to a 6.0% commission plus $295.00 upon closing of the Property with 2.4% going to the Purchaser's agent, if any, and the remaining 3.6% being retained by the Realtor. The Listing Agreement is attached hereto as **Exhibit C**.

55. As such, upon the closing of the sale of the Property for $285,000.00, Realtor will become entitled to a commission of $17,100.00 (plus $295.00) with $6,840.00 of that amount going to Purchaser's agent, if applicable.

56. The Trustee respectfully requests that he be authorized to pay the Realtor its full commission out of the Estate's portion of the sale proceeds.

57. The Trustee's counsel will submit a separate application for legal fees in connection with the sale, in addition to the legal work it has performed on behalf of the Trustee to date.

## THE TRUSTEE SHOULD BE AUTHORIZED TO SELL THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO SECTION 363(b) AND (f)

58. A trustee may sell property of an estate pursuant to 11 U.S.C. § 363(b)(1), which provides that "[t]he Trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." Additionally, Bankruptcy Code § 105(a) allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

59. Although the Bankruptcy Code gives no guidance regarding circumstances under which a sale of assets can be approved (other than the requirement to provide notice and a

hearing), the United States Court of Appeals for the Third Circuit, in the seminal case of *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986), interpreted § 363(b) to require a finding by the Bankruptcy Court that the purchaser of a debtor's assets is a good faith buyer. The Third Circuit construed the "good faith buyer" standard to mean one who purchases in "good faith" and for "value." *Abbotts Dairies,* 788 F.2d at 147.

60.    The *Abbotts Dairies* court compared a § 363(b) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the Trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Industries Mach. Corp*., 572 F.2d 1195, 1198 (7th Cir. 1978).

61.    The Third Circuit has adopted the "sound business purpose" test when examining the reason for an asset sale first articulated in *Official Committee of Unsecured Creditors v. Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *see In re Indus. Valley Ref. & Air Cond. Supplies, Inc.*, 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

62.    In *Lionel*, the Second Circuit held that:

> There must be some articulated business justification . . . for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under [s]ection 363(b) . . . The rule we adopt requires that a judge determining a [section] 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*Lionel*, 722 F.2d at 1070-71.

63. The proposed sale of the Property meets the Third Circuit's requirement for a sale of assets out of the ordinary course of business.

64. A sound business reason exists because the Property is the Debtor's last remaining asset that can be used for a potential distribution to unsecured creditors.

65. The proposed sale requires that the Property be sold to the successful bidder free and clear of all liens, claims, encumbrances and other interests. The Bankruptcy Code recognizes that courts may allow the sale of assets free and clear of such liabilities.

66. Pursuant to § 363(f), a Debtor's property may be sold free and clear of any and all liens, claims or interests in such property if (1) such a sale is permitted under applicable non-bankruptcy law, (2) the party asserting such a lien, claim or interest consents to such sale, (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (4) the interest is the subject of a bona fide dispute, or (5) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C. § 363(f); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[s]ection 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met").

67. A sale free and clear of liens, claims, interests and encumbrances is necessary to maximize the value of the Property. A sale subject to liens, claims, interests and encumbrances would likely result in a lower purchase price and result in substantially less of a benefit to the Debtor's Estate.

68. In this case, the purchase price of $285,000.00 far exceeds PHH Mortgage's mortgage on the Property in the approximate amount of $112,244.70. Thus, § 363(f)(3) of the

Bankruptcy Code is satisfied. The Trustee does not believe that there are any further liens on the Property.

69. Any putative holders of interests against the Property can also be compelled to accept a money satisfaction of such interests in legal or equitable proceedings in accordance with § 363(f)(5) of the Bankruptcy Code, so the standard for a sale free and clear of liens is again satisfied.

70. The Trustee also reserves his right to seek to recover out of any payment to any potential *ad valorem* taxing authority, the reasonable necessary costs and expenses of disposing of the Property under § 506(c) of the Bankruptcy Code.

71. In the event there are any additional liens that have or may be asserted against the Property, to the extent they are valid and enforceable liens, they will be satisfied from the proceeds of the sale. Any liens, claims, interests and encumbrances may attach to the proceeds of the sale in the order of their priority, with the same validity, force and effect that they now have as against the Debtor's assets, subject to the rights, claims, defenses and objections, of the Trustee and all interested parties with respect to such liens and claims, all of which are expressly reserved.

72. Based on the foregoing, the Trustee submits that the proposed sale is in the best interest of the Debtor's Estate as it will enable the Trustee to make a distribution to the Debtor's unsecured creditors.

73. The Trustee further submits that the contemplated sale meets the requirements of § 363(f) and therefore should be free and clear of any and all liens, claims, interests, and encumbrances with any liens attaching to the proceeds of the sale subject to the Trustee's rights under § 506(c).

## WAIVER OF 14 DAY STAY

74. Pursuant to Federal Rule of Bankruptcy Procedure 6004(h), unless the Court orders otherwise, orders authorizing the sale of the assets pursuant to § 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order. The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.

75. The fourteen-day period may be eliminated to allow a sale or transaction to close immediately. The Trustee asserts that given the goal to liquidate assets and bring this case to conclusion in the short term, there is cause to waive the stay and the Trustee requests that upon approval of the sale, the fourteen (14) day stay period pursuant to Rule 6004(h) be waived by the Court.

## NOTICE

76. Notice of this Application is being provided to: (1) The Office of the United States Trustee; (2) the Debtor; (3) Perrault Jean Paul, the former owner of the Property; (4) Carline Bolivar, the Debtor's principal; (5) Alexandria and Joseph Lenz and Damon Bruce, the current Occupants of the Property; (6) The City of Milwaukee, creditor; (7) PHH Mortgage, the mortgagee of the Property; and (8) any other interested parties as determined by the Trustee or the Court upon ruling on the Trustee's Application to Shorten Time filed concurrently with the Sale Motion.

## CONCLUSION

77. For all of the foregoing reasons, the Trustee respectfully requests that this Court enter the accompanying Order (1) Authorizing Chapter 7 Trustee to Sell the Debtor's Residential Real Property located at 3269 South New York Avenue, Milwaukee, Wisconsin 53207 Free and

Clear of any Liens, Claims, and Encumbrances pursuant to 11 U.S.C. § 363(b) and (f); (2) Authorizing Payment of Real Estate Broker's Commission from the Sale Proceeds; (3) Waiving the Stay Pursuant to Fed. R. Bankr. P. 6004(h); and (4) for other related relief.

                    **BECKER LLC**
                    Counsel to Eric R. Perkins, Chapter 7 Trustee

            By: */s/ Justin Baumgartner, Esq.*
                Justin Baumgartner, Esq.

Dated: March 17, 2023